**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason M. Guinn, | No. CV-21-01822-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff challenges the denial of his applications for benefits under the Social Security Act ("the Act") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed Plaintiff's opening brief (Doc. 14), the Commissioner's answering brief (Doc. 15), and Plaintiff's reply (Doc. 18), as well as the Administrative Record (Doc. 11, AR), and now affirms the Administrative Law Judge's ("ALJ") decision.

I.      Procedural History

On August 22, 2018, Plaintiff filed an application for disability and disability insurance benefits. (AR at 15.) Later, Plaintiff protectively filed a Title XVI application for supplemental security income. (*Id.*) In both applications, Plaintiff alleged disability beginning on August 8, 2017. (*Id.*) The Social Security Administration ("SSA") denied Plaintiff's application at the initial and reconsideration levels of administrative review and Plaintiff requested a hearing before an ALJ. (*Id.*) On February 17, 2021, following a hearing and supplemental hearing, the ALJ issued an unfavorable decision. (*Id.* at 15-30.)

1   The Appeals Council later denied review.

2   II.    The Sequential Evaluation Process And Judicial Review

3           To determine whether a claimant is disabled for purposes of the Act, the ALJ

4   follows a five-step process.  20 C.F.R. § 404.1520(a).  The claimant bears the burden of

5   proof on the first four steps, but the burden shifts to the Commissioner at step five.  *Tackett*

6   *v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  At the first step, the ALJ determines whether

7   the claimant is presently engaging in substantial gainful activity.  20 C.F.R.

8   §404.1520(a)(4)(i).  At step two, the ALJ determines whether the claimant has a "severe"

9   medically determinable physical or mental impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  At

10  step three, the ALJ considers whether the claimant's impairment or combination of

11  impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P

12  of 20 C.F.R. Part 404.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is automatically

13  found to be disabled.  *Id.*  At step four, the ALJ assesses the claimant's residual functional

14  capacity ("RFC") and determines whether the claimant is still capable of performing past

15  relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If not, the ALJ proceeds to the fifth and

16  final step, where she determines whether the claimant can perform any other work in the

17  national economy based on the claimant's RFC, age, education, and work experience.  20

18  C.F.R. § 404.1520(a)(4)(v).  If not, the claimant is disabled.  *Id.*

19          An ALJ's factual findings "shall be conclusive if supported by substantial

20  evidence."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019).  The Court may set aside

21  the Commissioner's disability determination only if it is not supported by substantial

22  evidence or is based on legal error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

23  Substantial evidence is relevant evidence that a reasonable person might accept as adequate

24  to support a conclusion considering the record as a whole.  *Id.*  Generally, "[w]here the

25  evidence is susceptible to more than one rational interpretation, one of which supports the

26  ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278 F.3d 947,

27  954 (9th Cir. 2002) (citations omitted).  In determining whether to reverse an ALJ's

28  decision, the district court reviews only those issues raised by the party challenging the

1   decision.  *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

2   III.    The ALJ's Decision

3           The ALJ found that Plaintiff had not engaged in substantial, gainful work activity

4   since the alleged onset date and that Plaintiff had the following severe impairments:

5   "cervical and lumbar degenerative disc disease, post laminectomy syndrome, and

6   nonspecific paroxysmal spell."  (AR at 182.)[1]  Next, the ALJ concluded that Plaintiff's

7   impairments did not meet or medically equal a listing.  (*Id.* at 20-21.)  Next, the ALJ

8   calculated Plaintiff's RFC as follows:

9           [T]he claimant has the residual functional capacity to perform medium work
10          as defined in 20 CFR 404.1567(c) and 416.967(c) except he can push/pull as
            much as he can lift/carry.  He can frequently handle, finger, or feel and
11          occasionally reach overhead bilaterally.  The claimant can frequently stoop,
            balance, kneel, crouch, crawl, and climb ramps/stairs, but never climb
12          ladders, ropes, or scaffolds.  He can never work around unprotected heights,
            moving mechanical parts, nor operate a motor vehicle.  In addition, the
13          claimant can occasionally work around dust, odors, fumes, pulmonary
            irritants, extreme cold, extreme heat, vibration.  He can be exposed to
14          moderate noise.
15

16  (*Id.* at 21.)

17          As part of this RFC determination, the ALJ evaluated Plaintiff's symptom

18  testimony, concluding that Plaintiff's "statements concerning the intensity, persistence and

19  limiting effects of [his] symptoms are not entirely consistent with the medical evidence and

20  other evidence in the record for the reasons explained in this decision." (*Id.* at 21-24.)  The

21  ALJ also evaluated opinion evidence from various medical sources, concluding as follows:

22  (1) Dr. Shelly Woodward, consultative psychologist ("persuasive"); (2) Dr. Gregory

23  Lazarz, neurologist ("unpersuasive"); (3) Dr. Heath Spivey, primary care provider

24  ("unpersuasive"); (4) reviewing medical consultants with the State agency ("persuasive").

25  (*Id.* at 24-28.)

26

27  _____

    [1]    The ALJ also noted that Plaintiff had asthma, trigger finger in the right ring finger,
28  kidney problems, and right elbow pain, as well as the "mental impairments of depression
    and anxiety," but concluded that none of these impairments qualified as severe.  (AR at 18-
    20.)

Based on the testimony of a vocational expert, the ALJ concluded that although Plaintiff was incapable of performing his past relevant work as a deputy sheriff and truck driver, he was capable of performing other jobs that exist in significant numbers in the national economy, including counter clerk, host, and rental clerk. (*Id.* at 28-29.) Thus, the ALJ concluded that Plaintiff is not disabled. (*Id.* at 30.)

IV.   Discussion

Plaintiff presents five issues on appeal: (1) whether the ALJ erred by characterizing his mental impairments as non-severe during step two of the sequential analysis (Doc. 14 at 7-11); (2) whether the ALJ erred when discrediting the opinions of Dr. Spivey (*id.* at 11-14); (3) whether the ALJ erred when discrediting the opinions of Dr. Lazarz (*id.* at 14-16);[2] (4) whether the ALJ erred when discrediting his symptom testimony (Doc. 15 at 16-18); and (5) whether the ALJ erred by rejecting lay witness testimony and not giving any reasons for the rejection (*id.* at 18-20). As a remedy, Plaintiff seeks a remand for calculation of benefits pursuant to the credit-as-true rule. (*Id.* at 25.)

A.   **Step Two**

To proceed beyond step two in the sequential evaluation, the claimant must have a severe impairment, or a combination of severe impairments, that "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citations omitted). Notably, "[s]tep two is merely a threshold determination meant to screen out weak claims." *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017) (citation omitted). Because the ALJ must evaluate the functional impact of both severe and non-severe impairments when determining the RFC, "[t]he RFC . . . should be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Id.* at 1049 (emphasis omitted).

---

[2]   Although Plaintiff groups his challenges regarding Drs. Spivey and Lazarz together under a single heading (Doc. 14 at 1, 11), the Court separates those challenges here for purposes of analytical clarity.

Plaintiff argues the ALJ erred by finding that his depression and anxiety were non-severe for purposes of step two. (Doc. 14 at 7-11.) Plaintiff notes that despite the ALJ's conclusions to the contrary, he participated in "formal mental health treatment" consisting of medication management through his primary care providers, and that his treatment records, including the assessments of his family doctor and neurologist, support that he has significant workplace limitations resulting from his depression and anxiety. (*Id*.) Plaintiff argues that because the RFC did not properly account for his mental health impairments, the VE testimony supporting the ALJ's conclusion at step five "has no evidentiary value." (*Id*. at 11.) The Commissioner responds that the ALJ relied upon the opinions of three different psychologists when concluding that Plaintiff's mental impairments were not severe and that substantial evidence supports the ALJ's conclusions. (Doc. 15 at 7-9.)

Plaintiff is not entitled to reversal based on his claim of step-two error. "As this Court has observed in earlier cases, Ninth Circuit law is not a model of clarity concerning how to evaluate claims of step-two error. Some cases suggest that, although it is error for an ALJ to fail to characterize a particular impairment as 'severe' during step two, the error can be disregarded as harmless if the ALJ properly addresses the impairment during later steps. Other decisions suggest that a claimant can't complain about an ALJ's failure to identify a particular impairment as 'severe' during step two so long as the ALJ determined the claimant also had other impairments that so qualify. At any rate, the dispositive issue is whether the ALJ properly evaluated the evidence and testimony concerning that condition during later steps and factored that condition into the RFC." *Harvey v. Comm'r of Soc. Sec. Admin.*, 2021 WL 5822641, *2 (D. Ariz. 2021) (cleaned up). Here, Plaintiff has separately argued that the ALJ erred by rejecting the mental impairment-related opinions of Drs. Spivey and Lazarz and failing to incorporate those opinions into the RFC. If Plaintiff prevails on that challenge, he will be entitled to relief irrespective of his claim of step-two error. And if Plaintiff does not prevail on that challenge, any theoretical step-two error was harmless. Thus, reversal is not warranted on this basis.[3]

_____

[3] At any rate, the ALJ's RFC findings regarding Plaintiff's mental health are adequately supported. The ALJ cited evidence of Plaintiff's ability to concentrate,

B.    **Dr. Spivey**

1.    Standard Of Review

In January 2017, the SSA amended the regulations concerning the evaluation of medical opinion evidence. *See Revisions to Rules Regarding Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). Because the new regulations apply to applications filed on or after March 27, 2017, they are applicable here.

The new regulations, which eliminate the previous hierarchy of medical opinions, provide in relevant part as follows:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources . . . . The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency . . . .

20 C.F.R. § 416.920c(a).[4] Regarding the "supportability" factor, the new regulations explain that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), . . . the more persuasive the medical opinions . . . will be." *Id.* § 404.1520c(c)(1). Regarding the "consistency" factor, the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2)

Recently, the Ninth Circuit confirmed that the "recent changes to the Social Security

---

including evidence of his ability to read, drive, and manage funds. (AR at 20, citing AR at 423-31, 455-62.) The ALJ also deemed persuasive the opinion of the psychological examiner who, despite concluding that certain diagnoses were appropriate, ultimately "noted no significant limitations secondary to [Plaintiff's] anxiety or depression." (*Id.* at 25.) The ALJ found the psychologist's conclusions consistent with treatment notes showing "mostly normal" psychiatric examinations and with Plaintiff's reported daily activities. (*Id.* at 25-26.) Substantial evidence supports the ALJ's rationale that Plaintiff often displayed an appropriate mood and affect (*id.* at 564, 569, 643, 645, 647, 972), normal attention and concentration (*id.* at 564, 569), and no depression, anxiety, or agitation (*id.* at 596, 601, 606).

[4]     Other factors that may be considered by the ALJ in addition to supportability and consistency include the provider's relationship with the claimant, the length of the treatment relationship, the frequency of examinations, the purpose and extent of the treatment relationship, and the specialization of the provider. 20 C.F.R. § 416.920c(c).

Administration's regulations displace our longstanding case law requiring an ALJ to provide 'specific and legitimate' reasons for rejecting an examining doctor's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022).  Thus, "the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies.  Now, an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id.*  With that said, "[e]ven under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence.  The agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings." *Id.* at 792 (cleaned up).  Although an "ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records . . . the ALJ no longer needs to make specific findings regarding these relationship factors . . . ." *Id.*

## 2.     Dr. Spivey's Opinions

On April 21, 2020, Plaintiff's treating family practitioner, Dr. Spivey, completed a Physical Capacities Evaluation.  (AR at 965-66.) In it, Dr. Spivey described Plaintiff's symptoms as "constant pain in back, neck and most joints, blackout spells with anxiety" and opined that Plaintiff would be significantly limited in his abilities to sit, stand, walk, lift or carry weights, engage in various postural maneuvers, and be exposed to various environmental factors. (*Id.*)   Dr. Spivey also opined Plaintiff would have moderate, moderately severe, or severe limitations in his ability to pay attention to or concentrate on tasks, maintain interpersonal relationships, respond to customary work pressures or stress, and provide consistent work effort.  (*Id.* at 966.)  Dr. Spivey estimated Plaintiff would likely be absent from work more than four days each month.  (*Id.*)

3.    The ALJ's Evaluation Of Dr. Spivey's Opinions

The ALJ deemed Dr. Spivey's opinions "unpersuasive." (*Id.* at 27.)  The ALJ's full

rationale for this determination was as follows:

> The undersigned finds the opinion of Dr. Spivey unpersuasive.  He also
> seemed to rely heavily on the claimant's subjective complaints because the
> claimant's multiple brain MRIs and EEGs were unremarkable.  Dr. Spivey
> noted that the claimant would have limitations with attention/concentration,
> maintaining interpersonal relationships, responding to customary work
> pressures, and work effort.  However, as stated above, Dr. Woodward noted
> no mental impairments based on exam and evaluation.  Moreover, Dr. Spivey
> is not a psychiatrist, psychologist, or other mental health specialist to assess
> the claimant's mental health limitations.  Due to the claimant's lack of
> aggressive mental health treatment and reports of improvement of his anxiety
> with sertraline and buspirone, there was no indication that the claimant
> suffered from severe disabling stress or anxiety.  MRI of the lumbar spine
> dated July 17, 2019 revealed minimal right L4-L5 and L5-S1 facet arthrosis
> without central canal, lateral recess, or foraminal stenosis.   There was
> unremarkable conus and cauda equine.  In June 2020, cervical spine x-ray
> showed three level fusion, ACDF, and degenerative spondylosis, but no
> fracture.  EMG of the right upper extremity dated May 26, 2020 was within
> normal limits.  The claimant's reports of improvement of pain with his
> prescribed medications and conservative treatment show that his pain was
> not as disabling as alleged.  Physical exams revealed mostly normal gait,
> coordination, range of motion, strength, tone, and sensation with negative
> straight leg raises and intact cranial nerves.  Thus, Dr. Spivey's extreme
> limitations are unsupported by the overall objective medical evidence.
> Furthermore, the claimant was higher functioning than alleged as he
> continued to report that he was able to tend to his personal hygiene, prepare
> simple meals, perform light household chores, manage his finances, drive
> independently, take care of his dog, help his elderly parents, travel to
> Montana, and shop.

(*Id.*, citations omitted.)

Put another way, the ALJ identified the following five reasons for discrediting Dr.

Spivey's opinions related to Plaintiff's mental impairments: (1) inconsistency with, and

lack of support from, medical records (unremarkable brain MRIs and EEGs); (2)

inconsistency with the opinions of other medical providers (Dr. Woodward); (3) Dr.

Spivey's lack of specialization; (4) inconsistency with the absence of aggressive mental

health treatment; and (5) inconsistency with Plaintiff's improvement from other forms of mental health treatment. Separately, the ALJ identified the following four reasons for discrediting Dr. Spivey's opinions related to Plaintiff's physical impairments: (1) inconsistency with medical records (MRIs and cervical spine x-rays); (2) inconsistency with Plaintiff's improvement from various forms of conservative treatment; (3) unsupported by the results of Dr. Spivey's physical exams; and (4) inconsistency with Plaintiff's activities of daily living ("ADLs").

### 4.   The Post-Hearing Submission

On April 29, 2021—that is, after the issuance of the ALJ's decision, but before the Appeals Council denied review—Dr. Spivey filled out a questionnaire. (*Id.* at 536.) In this questionnaire, Dr. Spivey stated that he agreed with the ALJ's determination that the Plaintiff's multiple brain MRIs and EEGs were allegedly unremarkable. (*Id.*) However, Dr. Spivey disagreed with the ALJ's determinations as to other issues related to Plaintiff's mental health impairments. (*Id.*)

When denying review, the Appeals Council stated that it had "considered the reasons" that Plaintiff had "submitted [as to why] you disagree with the decision" and "exhibited them on the enclosed Order of the Appeals Council." (*Id.*) The corresponding order clarifies that Plaintiff's "Representative Brief, dated May 7, 2021" was among the pieces of evidence considered by the Appeals Council. (*Id.*) The order also specifies that the "Representative Brief" appeared as Exhibit 36E in the administrative record. (*Id.*) The index to the administrative record, in turn, states that the "Representative Brief" labeled as Exhibit 36E appears at pages 527-36 of the administrative record. (AR, unnumbered index between pages 500 and 501.) Dr. Spivey's questionnaire, which appears at page 536, was part of this exhibit.

### 5.   The Parties' Arguments

As an initial matter, Plaintiff argues—incorrectly, in light of *Woods*—that the new regulations "do not replace long-standing Ninth Circuit precedent that affords primacy to treating physician medical opinion evidence." (Doc. 14 at 11.) On the merits, Plaintiff

seems to identify the following reasons why the evaluation of Dr. Spivey's opinions was erroneous: (1) the Appeals Council disregarded Dr. Spivey's post-hearing questionnaire (*id.* at 10); (2) Dr. Spivey's lack of specialization is irrelevant because "Dr. Spivey need not be a mental health specialist in order to comment on how that impairment effect a claimant's ability to work" (*id.* at 13); and (3) the ADLs identified by the ALJ were not inconsistent with Dr. Spivey's opined-to limitations (*id.* at 13-14).

In response, the Commissioner argues that the ALJ's evaluation of Dr. Spivey's opinions was permissible under the new regulations and that most of Plaintiff's arguments are misplaced because they are based on the old regulations. (Doc. 15 at 13-14.) More specifically, the Commissioner argues that the ALJ expressly considered the consistency and supportability factors when analyzing Dr. Spivey's opinions and provided multiple reasons why each factor undermined Dr. Spivey's opinions. (*Id.* at 18-19.)

In reply, Plaintiff essentially restates the arguments related to Dr. Spivey that appear in his opening brief. (Doc. 18 at 3-6.) Plaintiff also argues, in reliance on Ninth Circuit caselaw that predates the new regulations, that the ALJ could not discredit Dr. Spivey's opinions simply because they conflicted with the opinions of other medical sources. (*Id.* at 7.)

6.   Analysis

The Court finds no harmful error in the ALJ's evaluation of Dr. Spivey's opinions. The new regulations require consideration of the consistency and supportability factors. The ALJ expressly considered these factors in the underlying decision and identified multiple reasons why each factor undermined the persuasiveness of Dr. Spivey's opinions. Plaintiff, however, makes no effort to challenge some of those reasons—instead, he identifies only a small subset of the ALJ's reasons (*i.e.*, lack of specialization and inconsistency with ADLs) and attempts to demonstrate that those reasons were not supported by substantial evidence. But even if Plaintiff were correct as to those reasons, the ALJ also identified many other seemingly unchallenged reasons why Dr. Spivey's opinions lacked support and/or were inconsistent with other evidence in the record. This,

alone, requires affirmance as to Dr. Spivey.  *See, e.g., Reed v. Saul*, 834 F. App'x 326, 329 (9th Cir. 2020) ("To the extent the ALJ erred in discounting the opinions of Dr. Cochran because her opinions were based in part on Reed's self-reports of his symptoms, that error is harmless because the ALJ offered multiple other specific and legitimate reasons for discounting Dr. Cochran's opinions."); *Baker v. Berryhill*, 720 F. App'x 352, 355 (9th Cir. 2017) ("Two of the reasons the ALJ provided for discounting examining psychologist Dr. Wheeler's opinion were not legally valid . . . [but] the ALJ provided other specific and legitimate reasons for discounting Dr. Wheeler's opinion. . . .  As a result, any error was harmless."); *Presley-Carrillo v. Berryhill*, 692 F. App'x 941, 944-45 (9th Cir. 2017) ("The ALJ also criticized Dr. Van Eerd's opinion in part because Dr. Van Eerd did not define the terms 'mild,' 'moderate,' or 'severe' in his assessment.  This criticism was improper . . . [but] this error was harmless because the ALJ gave a reason supported by the record for not giving much weight to Dr. Van Eerd's opinion—specifically, that it conflicted with more recent treatment notes from Dr. Mateus.").

Nor is there any merit to Plaintiff's contention that the Appeals Council ignored Dr. Spivey's post-hearing questionnaire.  As discussed above, the Appeals Council specifically identified Plaintiff's "Representative Brief," which included Dr. Spivey's questionnaire, as one of the materials it considered when denying review.  At any rate, Dr. Spivey acknowledged in that questionnaire that the ALJ was correct to conclude that his opined-to limitations "seem to rely heavily on Mr. Guinn's subjective complaints because his multiple brain MRIs and EEGs were allegedly unremarkable."  (AR at 536.)  This acknowledgement, if anything, underscores why it was permissible for the ALJ to determine that the supportability and consistency factors (which, again, are the mandatory considerations under the new regulations) undermined the persuasiveness of Dr. Spivey's opinions.

…

…

…

1      C.   **Dr. Lazarz**

2           1.   Dr. Lazarz's Opinions

3           On May 7, 2020, Plaintiff's treating neurologist, Dr. Lazarz, completed a "Mental

4    Residual Functional Capacity Assessment."  (AR at 1212-14.)  Dr. Lazarz assigned mostly

5    "moderate" limitations in different functional categories, defined as a limitation causing

6    "noticeable difficulty" or distraction from job activity for 11-20% of the workday.  (*Id*. at

7    1212-13.)  Dr. Lazarz also stated he was treating Plaintiff for "episodes of amnesia" that

8    underlined Plaintiff's working ability.  (*Id*. at 1214.)

9           In a separate "Residual Functional Capacity Questionnaire" completed the same

10   day, Dr. Lazarz addressed the functional impact of Plaintiff's amnestic spells.  (*Id*. at 1215-

11   18.)  Dr. Lazarz indicated that the nature of Plaintiff's seizure activity was unclear and was

12   being evaluated, that Plaintiff experienced the episodes once per week, that a typical

13   episode lasted one day, and that the episodes are precipitated by pain and anxiety.  (*Id*. at

14   1215.)  Dr. Lazarz opined Plaintiff was capable of only "low stress jobs" and would likely

15   miss "about four days" of work per month.  (*Id*. at 1217-18).  Dr. Lazarz noted that Plaintiff

16   would experience impairment in his memory, executive functioning, and ability to work

17   with others because of these episodes.  (*Id*. at 1218.)

18           2.   The ALJ's Evaluation Of Dr. Lazarz's Opinions

19           The ALJ deemed Dr. Lazarz's opinions "unpersuasive."  (*Id*. at 26.)  The ALJ's full

20   rationale for this determination was as follows:

21           The undersigned finds the opinion of Dr. Lazarz unpersuasive.  He seemed
22           to rely heavily on the claimant's subjective complaints because the
             claimant's multiple brain MRIs and EEGs were unremarkable.  Dr. Lazarz
23           noted that the claimant would have limitations due to a memory impairment.
             However, as stated above, Dr. Woodward noted no memory impairment
24           based on Folstein Mini Mental Status exam wherein the claimant scored 28
             out of 30.  Dr. Lazarz indicated the claimant had executive dysfunction, but
25           his treatment notes show that the claimant continued to report that he could
             continue to drive, eat, drink, and perform normal functions while having
26           these spells/episodes.  Dr. Lazarz reported the claimant had inability to work
             with others while he was having spell/episode, but there is no objective to
27           support this.  In fact, Dr. Lazarz indicated that it was unclear if the claimant
28

1
2
3
4
5
6
7
8
9

was having seizures and that he was still being evaluated.  He further stated the diagnosis was spells of unclear etiology, but were triggered by pain, stress, and anxiety.  Due to the claimant's lack of aggressive mental health treatment and reports of improvement of his anxiety with sertraline and buspirone, there was no indication that the claimant suffered from severe disabling stress or anxiety.  The claimant's reports of improvement of pain with his prescribed medications show that his pain was not as disabling as alleged.  Thus, Dr. Lazarz's extreme limitations are unsupported by his treatment notes and pain management records.  Furthermore, the claimant was higher functioning than alleged as he continued to report that he was able to tend to his personal hygiene, prepare simple meals, perform light household chores, manage his finances, drive independently, take care of his dog, help his elderly parents, travel to Montana, and shop.

10

(*Id.* at 26-27, citations omitted.)

11
12
13
14
15
16
17
18

Put another way, the ALJ identified the following seven reasons for discrediting Dr. Lazarz's opinions related to Plaintiff's mental impairments: (1) inconsistency with, and lack of support from, medical records (unremarkable brain MRIs and EEGs); (2) inconsistency with the opinions of other medical providers (Dr. Woodward); (3) lack of support from Dr. Lazarz's treatment notes; (4) Dr. Lazarz's acknowledgement that the etiology of certain symptoms was unclear; (5) inconsistency with the absence of aggressive mental health treatment; (6) inconsistency with Plaintiff's improvement from other forms of mental health treatment; and (7) inconsistency with Plaintiff's ADLs.

19

### 3.    The Parties' Arguments

20
21
22
23
24
25
26
27
28

After summarizing Dr. Lazarz's opinions and the ALJ's reasons for discrediting those opinions (Doc. 14 at 14-15), Plaintiff identifies the following reasons why the ALJ's reasoning was erroneous: (1) "contrary to the ALJ's assertions, [Plaintiff's] activities of daily living are not extensive and are interspersed with breaks to rest"; (2) "[Plaintiff] did have mental health treatment, including trials of many different medications, through his primary care provider"; and (3) "Dr. Lazarz specifically noted that the memory impairment, executive dysfunction, and social deficits would be a problem only when [Plaintiff] was actively in the midst of a blackout episode during work hours, and estimate this would happen about once a week.  This explains why the consultative examiner, who

1    examined [Plaintiff] when he was not in the midst of an episode, would not have noted any

2    memory impairment." (*Id.* at 14-16.)

3         In response, the Commissioner defends the sufficiency of the ALJ's rationale for

4    discrediting Dr. Lazarz's opinions. (Doc. 15 at 17-18.) The Commissioner's analysis

5    consists of summarizing the ALJ's reasoning and explaining why this reasoning, which

6    touched upon the consistency and supportability factors, was sufficient under the new

7    regulations. (*Id.*)

8         In reply, Plaintiff essentially restates the arguments related to Dr. Lazarz that appear

9    in his opening brief. (Doc. 18 at 6-7.) Plaintiff also argues, in reliance on Ninth Circuit

10   caselaw that predates the new regulations, that the ALJ could not discredit Dr. Lazarz's

11   opinions simply because they conflicted with the opinions of other medical sources. (*Id.*

12   at 7.)

13                    4.    Analysis

14        The Court finds no harmful error in the ALJ's evaluation of Dr. Lazarz's opinions.

15   The analysis here mirrors the analysis concerning Dr. Spivey. Plaintiff seeks reversal based

16   on the standards that were applicable under the old regulations and fails to acknowledge—

17   let alone challenge—many of the ALJ's proffered reasons for concluding that Dr. Lazarz's

18   opinions lacked supportability and consistency. Instead, Plaintiff focuses on only a subset

19   of the ALJ's proffered reasons and attempts to establish that those reasons were factually

20   unsupported or inadequately explained. But even if Plaintiff were correct as to that subset

21   of the ALJ's reasons, any error would be harmless in light of the ALJ's identification of

22   other, unchallenged reasons why Dr. Lazarz's opinions lacked supportability and

23   consistency. *See, e.g., Reed*, 834 F. App'x at 329; *Baker*, 720 F. App'x at 355; *Presley-*

24   *Carrillo*, 692 F. App'x at 944-45.

25        In any event, the Court agrees—at a minimum—with the Commissioner's

26   arguments as to why substantial evidence supports the ALJ's findings of inconsistency (Dr.

27   Cunningham's opinions and testing) and lack of supportability (unremarkable MRI and

28   EEG findings and Dr. Lararz's own acknowledgements of unclear etiology).

D.     **Symptom Testimony**

1.     Standard Of Review

An ALJ must evaluate whether the claimant has presented objective medical evidence of an impairment that "could reasonably be expected to produce the pain or symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007) (citations omitted). If so, "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005). Instead, the ALJ may "reject the claimant's testimony about the severity of [the] symptoms" only by "providing specific, clear, and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488–89 (9th Cir. 2015).

2.     The ALJ's Evaluation Of Plaintiff's Symptom Testimony

The ALJ provided the following summary of Plaintiff's symptom testimony:

On the Disability Report – Adult, the claimant alleged disability based on blackout/seizure, neck injury, back injury, foot injury, kidney problems, and severe anxiety. On the Function Reports – Adult, the claimant reported that his impairments affect his ability to lift, squat, bend, stand, walk, sit, kneel, remember, complete tasks, and concentrate. Specifically, he described having extreme difficulty doing even the slightest chores at home due to constant pain that resulted in extreme anxiety. He reported having difficulty sleeping that caused episodes lasting several days. When the claimant updated the Disability Report at the reconsideration level, he reported a blockage in his right kidney that would require surgery or removal of kidney. At the hearing level, he reported seeing a specialist who advised him that surgery on his kidney was not possible and was referred to the Mayo Clinic.

At the hearing, the claimant testified he was able to drive short distances to the store. According to his wife, the claimant explained that he had lost his personality and was an angry person. The claimant stated he had seen a therapist for his anger issues. He reported kidney issues with pain, infections, and blood in his urine. The claimant stated he had accidents every week. He explained that he had started working at FedEx, but was unable to pass the training because he passed out. Thereafter, the claimant reported that he filed for unemployment. When asked if he was fired because he was taking pain medication, the claimant acknowledged that he was taking pain medication, but unsure why they would have fired him for taking pain medication. The claimant indicated that he is disabled due to his ongoing pain. He reported

that he lived with his parents and his wife helped take care of them because he had given up due to his pain. The claimant stated having problems with right hand and had difficulty lifting due to right shoulder pain.

(AR at 22.)

As noted, the ALJ declined to fully credit this testimony because Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id*.) The ALJ then identified the following reasons for making this determination.

First, as for Plaintiff's physical impairments, the ALJ stated they were "not supported by the objective findings of record or [his] treatment history." (*Id.* at 22-23.) In support of this determination, the ALJ provided a detailed summary of Plaintiff's medical records, which can be summarized as follows: (1) a June 2018 record showing that Plaintiff reported engaging in moderate physical activity and swimming; (2) a March 2018 record reflecting that although Plaintiff reported some pain, he also reported twice-weekly exercise and no side effects from medication and displayed normal gait, tone, and strength; (3) an imaging study of Plaintiff's lumbar spine that showed no nerve root impingement; (4) an October 2018 record showing that Plaintiff reported 80 percent relief of pain with medial branch block; (5) a November 2018 record in which Plaintiff was advised to reduce his opioid use; (6) a December 2018 record reflecting that Plaintiff was not in acute distress and had normal gait and station, strength, sensation, and tone; (7) an April 2019 record in which Plaintiff reported difficulty with pain control; (8) a May 2019 record in which Plaintiff reported that his pain was better managed with certain drugs; (9) a July 2019 spinal MRI that revealed largely negative findings; (10) a November 2019 record reflecting that Plaintiff "reported 80 percent of relief of pain for over 6 months with lumbar radiofrequency ablation"; (11) a January 2020 record reflecting that Plaintiff "stopped going to pain management" and reported that "he had not responded well to recent injection therapy"; (12) an April 2020 physical therapy record reflecting that Plaintiff "tolerated treatment well" and "reported no worsening of symptoms, showed improved quality in gait, and split stance movements following intervention"; and (13) a June 2020 record in

- 16 -

which Plaintiff reported improvement in his elbow since surgery but still some symptoms. (*Id.* at 23-24.)  Based on these records, the ALJ concluded: "Given his mostly conservative treatment, his improvement with his prescribed medications, 80 percent improvement in pain with injections, and mostly normal physical exams with normal strength, tone, and sensation, the undersigned cannot find the claimant is unable to sit, stand, or walk for prolonged periods." (*Id.* at 24.)

Second, as for Plaintiff's claims of epilepsy and seizures, the ALJ noted that various medical records and studies (including an April 2018 brain EEG, a July 2019 brain MRI, and a 2020 EEG) resulted in largely "normal" and "unremarkable" findings. (*Id.* at 24.) The ALJ also noted that "[d]espite his reports of syncope episodes, the claimant reported he was able to drive during his episodes." (*Id.*)

Finally, the ALJ noted that Plaintiff still maintains a driver's license and "continued to drive on a daily basis per his reports" and that Plaintiff "was higher functioning than alleged as he continued to report that he was able to tend to his personal hygiene, prepare simple meals, perform light household chores, manage his finances, drive independently, take care of his dog, help his elderly parents, travel to Montana, and shop." (*Id.* at 24-25.)

### 3.   The Parties' Arguments

Plaintiff characterizes the ALJ's opinion as identifying four reasons for discrediting his symptom testimony: (1) inconsistency with objective medical evidence; (2) improvement from medication; (3) conservative treatment; and (4) engagement in ADLs that were inconsistent with his testimony. (Doc. 14 at 16-17.)  Plaintiff argues that the ALJ's analysis as to the first reason was flawed because the ALJ simply summarized the evidence, without explaining why any of it was inconsistent with the specific functional deficits he described, and improperly focused on a few isolated periods of temporary well-being. (*Id.* at 17.)  In a similar vein, Plaintiff argues that the ALJ's analysis regarding his ADLs was flawed because the ALJ did not specifically explain why his activities were inconsistent with the limitations he described. (*Id.* at 17-18.)  Plaintiff also notes, in other sections of his brief, that the trip to Montana occurred before the alleged onset date. (*Id.*

at 14.)  However, Plaintiff does not specifically address why the ALJ's "improvement from treatment" and "conservative treatment" rationales for discrediting his symptom testimony were flawed.

The Commissioner defends the sufficiency of the ALJ's rationale for discrediting Plaintiff's symptom testimony.  (Doc. 15 at 9-13.)  As for the ALJ's first rationale (inconsistency with objective medical evidence), the Commissioner argues that the rationale was sufficiently detailed and supported by substantial evidence because the ALJ specifically pointed to examinations revealing normal gait and station, strength, and sensation, which were inconsistent with Plaintiff's testimony regarding pain and needing his wife to take care of him, and to EEG and MRI studies that resulted in normal findings, which were inconsistent with Plaintiff's claims of seizures and epilepsy.  (*Id.* at 10-11.)  As for the ALJ's second and third rationales (improvement from medication and conservative treatment), the Commissioner argues that they, too, were supported by substantial evidence in light of the evidence that Plaintiff's medical providers tapered his use of hydrocodone and that Plaintiff repeatedly reported improvement from treatment, including conservative treatment like physical therapy.  (*Id.* at 11-12.)  The Commissioner also argues that the ALJ did not "simply consider[] isolated periods of improvement" because "the record shows a consistent pattern of improvement, and not rare reports of relief against a background of ever-worsening symptoms."  (*Id.* at 12.)  As for the ALJ's fourth rationale (inconsistency with ADLs), the Commissioner acknowledges that the trip to Montana may have been before the period of alleged disability but argues that the other ADLs identified by the ALJ were sufficient—even if they, alone, would not translate to a full-time work schedule—because they contradicted Plaintiff's claims regarding his limited activity level.  (*Id.* at 12-13.)

In reply, Plaintiff again argues that the problem was the ALJ's failure to identify, with specificity, "any particular findings which were inconsistent with any of the specific functional deficits [Plaintiff] described."  (Doc. 18 at 8.)  Plaintiff also repeats his contention that the ALJ singled out a few isolated periods of well-being and improperly

focused on ADLs that "are not inconsistent with [his] testimony that he is unable to get along with people or sustain focus for long enough to make it through a typical work week without having a blackout episode." (*Id.* at 8-9.)

4. <u>Analysis</u>

The Court finds no harmful error in the ALJ's evaluation of Plaintiff's symptom testimony.

As an initial matter, Plaintiff does not meaningfully address or challenge the sufficiency of two of the ALJ's proffered rationales for rejecting his symptom testimony, which were that he experienced improvement from medication and only pursued conservative treatment. These are, in general, permissible reasons for discrediting a claimant's symptom testimony under Ninth Circuit law. *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) ("[T]he ALJ pointed to Tommasetti's testimony that his severe diabetes was not a 'disabling problem,' was controlled by medication, and was not the reason he stopped working. This testimony undermines Tommasetti's prior claims that his diabetes was among his disabling conditions."); *Fry v. Berryhill*, 749 F. App'x 659, 660 (9th Cir. 2019) ("The ALJ proffered specific, clear, and convincing reasons for discounting Fry's testimony concerning the severity of her symptoms, including . . . the effectiveness of Fry's conservative treatment."). *See also* 20 C.F.R. § 1529(c)(3)(iv)-(v) ("Factors relevant to your symptoms, such as pain, which we will consider include . . . [t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms . . . [and] [t]reatment, other than medication, you receive or have received for relief of your pain or other symptoms.").

Admittedly, it is not clear to the Court that Plaintiff's course of treatment could be characterized as conservative. *Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017) ("We have previously doubted that epidural steroid shots to the neck and lower back qualify as conservative medical treatment.") (cleaned up). Among other things, Plaintiff's providers administered lumbar epidural steroid injections (AR at 1303, 1305), medial branch blocks of the cervical and lumbar spine (*id.* at 621, 623, 1312), lumbar radiofrequency

denervations (*id.* at 758), and right elbow joint injections (*id.* at 922). Nor is it clear that Plaintiff experienced consistent relief from these treatments—although Plaintiff reported significant improvement following lumbar pain management procedures (AR at 758 ["Prior to discharge, Plaintiff reported having greater than 100% of pain relief following the procedure"]; *id.* at 1306 ["In the recovery area following the procedure, the patient reported pain relief of 85%."]),[5] other records indicate that Plaintiff's cervical disc disease was contemporaneously worsening. (*Id.* at 844.) Plaintiff exhibited progressive symptoms in his upper extremities in August and September 2019. (*Id.* at 838, 841.) In January 2020, Plaintiff reported pain relief from lumbar radiofrequency ablations but also reported that his neck pain was increasing. (*Id.* at 909.) Plaintiff's providers administered more lumbar epidurals in May and June 2020 after Plaintiff reported increased pain (*id.* at 1301, 1303, 1305), but pain management notes from the next month reflect a "significant exacerbation" of his pain, requiring four-to-five days of bedrest (*id.* at 1310). In October 2020, Plaintiff reported neck pain radiating into his arms and ongoing weakness. (*Id.* at 1288, 1340.) Plaintiff stated that his cervical spine symptoms were his most significant pain source. (*Id.* at 1297.) In December 2020, Plaintiff continued to report progressively worsening symptoms with weakness in his right hand. (*Id.* at 1328.)

Nevertheless, even if the Court were to disregard those rationales (despite Plaintiff's failure to raise specific challenges to those rationales), affirmance would be required because the ALJ identified multiple other clear and convincing reasons, supported by substantial evidence, for discrediting Plaintiff's testimony. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("[S]everal of our cases have held that an ALJ's error was harmless where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record."); *Carmickle*

---

[5] Plaintiff's reports of symptomatic improvement in the low back were also inconsistent. He reported no significant relief after an initial diagnostic branch block in August 2018, but he reported 80% relief after medial branch blocks in September 2018 (AR at 596, 758.) In late December 2020 he reported "no prolonged relief with lumbar injections." (*Id.* at 1334.) At his second hearing, he testified that the various pain management procedures were only "sometimes" effective and did not endorse significant relief. (*Id.* at 88.)

*v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) ("Because we conclude that two of the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error. . . . [T]he relevant inquiry in this context is not whether the ALJ would have made a different decision absent any error, it is whether the ALJ's decision remains legally valid, despite such error. . . . Here, the ALJ's decision finding Carmickle less than fully credible is valid, despite the errors identified above.").

First, it was permissible under Ninth Circuit law for the ALJ to discount Plaintiff's symptom testimony due to its inconsistency with Plaintiff's ADLs.  *Molina*, 674 F.3d at 1112-13 ("[T]he ALJ may consider inconsistencies . . . between the testimony and the claimant's conduct . . . and whether the claimant engages in daily activities inconsistent with the alleged symptoms. . . .  Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.") (cleaned up); *Fry,* 749 F. App'x at 660 ("The ALJ proffered specific, clear, and convincing reasons for discounting Fry's testimony concerning the severity of her symptoms, including inconsistencies between her daily activities and alleged limitations . . . .").

The ALJ's finding of inconsistency with ADLs was also supported by substantial evidence.  In his function reports, Plaintiff made such statements as "[m]y wife does pretty much everything for me and our dog" (AR at 398), "I can't bend, squat or stretch without extreme pain or numbness" (*id.* at 400), "I can only lift a few pounds, I have a hard time walking to the mail box" (*id.* at 402), and "I have extreme difficulty doing even the slightest chores at home [and] am in constant pain which causes anxiety" (*id.* at 423).  However, Plaintiff elsewhere acknowledged that he prepares simple meals, performs light household chores, provides some pet care, drives independently to the store, and helps his elderly parents.  (*Id.* at 398-403, 563, 717.)  Although it is true that Plaintiff made clear, when describing those activities, that his ability to perform them was limited, it was still rational for the ALJ to conclude that Plaintiff's ability to perform those activities in even a limited

fashion was inconsistent with Plaintiff's description of himself as unable to bend, squat, stretch, or lift more than a few pounds.  The Court also notes that, in some of the medical records cited by the ALJ in the portion of the decision evaluating the credibility of Plaintiff's symptom testimony, Plaintiff described himself as exercising regularly.  (AR at 22-23, citing AR 1191 [describing "Exercise" as "Moderate" in intensity and involving "Swimming"] and AR 599 ["Exercise: regularly (1-2 times/week)"].)  It would be rational to view such activity as inconsistent with Plaintiff's description of himself in the function reports as unable to bend, squat, stretch, or lift more than a few pounds.  Perhaps a different factfinder might have declined to find make a finding of inconsistency under these circumstances, but "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas*, 278 F.3d at 954.

Plaintiff seeks to avoid this conclusion by emphasizing that "the activities of daily living cited by the ALJ are not inconsistent with [Plaintiff's] testimony that he is unable to get along with people or sustain focus for long enough to make it through a typical work week without having a blackout episode."  (Doc. 14 at 17.)  This may be true, but it does not mean the ALJ was precluded from making an adverse credibility determination on this record.  The Ninth Circuit has recognized that a "tendency to exaggerate" is a "specific and convincing reason" for discrediting a claimant's testimony.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).  *See also Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) ("To determine whether the claimant's testimony regarding the severity of her symptoms is credible, the ALJ may consider . . . ordinary techniques of credibility evaluation, such as . . . prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid . . . .").  Upholding an adverse-credibility finding in this circumstance does not result in "disability claimants [being] penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).  Instead, upholding the finding simply reflects the common-sense principle that it is logical and permissible for a factfinder to doubt a

witness's veracity when the witness has been shown to exaggerate or misstate the facts.

Second, it was also permissible under Ninth Circuit law for the ALJ to discount Plaintiff's symptom testimony on the ground that it was inconsistent with the objective medical evidence in the record. Although this may not serve as an ALJ's sole reason for discounting a claimant's symptom testimony, it is a permissible consideration when (as here) it is coupled with other grounds for an adverse credibility finding. *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022) ("Claimants like Smartt sometimes mischaracterize [Ninth Circuit law] as completely forbidding an ALJ from using inconsistent objective medical evidence in the record to discount subjective symptom testimony. That is a misreading of [Ninth Circuit law]. When objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony. We have upheld ALJ decisions that do just that in many cases."); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.").

The ALJ's finding of inconsistency with the objective medical evidence was also supported by substantial evidence. As the Commissioner correctly notes, the ALJ specifically identified several examinations revealing normal gait and station, strength, and sensation, which were inconsistent with Plaintiff's claims regarding his pain, his inability to bend and squat, and needing his wife to take care of him, and also specifically identified several EEG and MRI studies that resulted in normal findings, which were inconsistent with Plaintiff's claims of seizures and epilepsy.

E.   **Lay Witness Testimony**

1.   The Parties' Arguments

In his final assignment of error, Plaintiff notes that his "wife, Kyla Guinn, completed a statement describing [his] limitations." (Doc. 14 at 4.) This statement appears at pages 445-51 of the administrative record. Plaintiff contends that "[t]he ALJ failed to discuss the

testimony of the lay witness" (*id.* at 6) and that "[t]he ALJ did not mention this evidence in the decision and gave no reasons for failing to consider the limitations the witness described" (*id.* at 19).  According to Plaintiff, "the ALJ's failure to base the rejection of the lay witness statement on the record and to give specific and legitimate reasons (or any reasons at all) germane to each witness is reversible error."  (*Id.* at 19-20.)

In response, the Commissioner argues that affirmance is required, either because ALJs are not required to specifically discuss statements from non-medical sources under the new regulations or alternatively because "if Plaintiff's wife submitted statements consistent with Plaintiff's allegations, and the ALJ properly evaluated Plaintiff's own statements, then any error in not reiterating those same findings in relation to the wife's similar testimony was harmless."  (Doc. 15 at 19-21.)

In reply, Plaintiff repeats his contention that the ALJ's failure to consider his wife's statement was reversible error.  (Doc. 18 at 9-10.)

### 2.   Analysis

Plaintiff is not entitled to reversal based on his arguments regarding his wife's lay witness statement.

As an initial matter, the Court notes that the Ninth Circuit has not definitively resolved whether ALJs must continue, following the issuance of the new SSA regulations in 2017, to provide reasons for rejecting lay-witness statements.  Lower courts have reached conflicting decisions on that issue.  *Compare Stricker v. Acting Comm'r of Soc. Sec. Admin.*, 2022 WL 3588215, at *6 (D. Ariz. 2022) ("Pursuant to Ninth Circuit caselaw from 1993, '[i]f the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness' . . . .  Defendant argues that caselaw no longer applies because the regulations have changed . . . [but] [t]his regulatory change does not provide that an ALJ need not articulate any reason for discounting evidence from lay witnesses, it only states that the ALJ's consideration need not follow the requirements for evaluating medical opinions.  This regulatory change is not inconsistent with the Ninth Circuit's germane-reasons standard.") *with Wendy J. C. v. Saul*, 2020 WL 6161402, *12

n.9 (D. Or. 2020) ("The new regulations provide the ALJ is 'not required to articulate how [they] considered evidence from nonmedical sources . . . .' As such, the ALJ is no longer required to provide reasons germane to lay witnesses to reject their testimony.").

Nevertheless, even assuming the reasoning requirement remains intact, the Ninth Circuit has recognized that the failure to provide such reasoning is harmless where (1) the ALJ provided legally sufficient reasons for rejecting the claimant's symptom testimony and (2) the lay witness did not describe any limitations beyond those identified by the claimant. *Molina*, 674 F.3d at 1122 ("Here, the ALJ failed to explain her reasons for rejecting the lay witnesses' testimony. That testimony, however, did not describe any limitations beyond those Molina herself described, which the ALJ discussed at length and rejected based on well-supported, clear and convincing reasons. . . . Because the ALJ had validly rejected all the limitations described by the lay witnesses in discussing Molina's testimony, we are confident that the ALJ's failure to give specific witness-by-witness reasons for rejecting the lay testimony did not alter the ultimate nondisability determination. Accordingly, the ALJ's error was harmless."). Here, both conditions are satisfied—the ALJ's rationale for discrediting Plaintiff's symptom testimony was legally valid, for the reasons stated in Part IV.D above, and Plaintiff's wife's third-party statement did not identify any limitations beyond those Plaintiff identified via his own testimony and function reports. (AR at 398-403 [Plaintiff's function report, describing limited driving, pet care, and household activities]; *id.* at 445-49 [wife's report, providing same description].)

This conclusion is not undermined by Plaintiff's assertion that his wife's statement explained "what happens during [Plaintiff's] blackout episodes," which Plaintiff "cannot describe . . . himself." (Doc. 18 at 9-10.) First, although it is obviously true that Plaintiff lacks first-hand knowledge of his conduct during his blackouts, Plaintiff conveyed, in his own testimony and reports, the same description of that conduct that Plaintiff's wife provided in her report. (AR at 50 [Plaintiff's testimony that, "[a]ccording to my wife," Plaintiff's "episodes . . . really [don't] affect my driving ability, but [they] affect[], I guess,

my personality. . . .  I don't know what I'm capable of or saying or doing to somebody."];
*id.* at 450 [wife's statement: "If he is having a blackout he is very mean and easily agitated.
He will have no memory of the event and always feels guilty for his behavior.  I have to
watch him constantly.  He wanders all night and will try to leave the house or cook which
would be a very bad idea."].)  Second, to the extent this description of Plaintiff's conduct
during blackouts could be considered the one piece of new information contained in
Plaintiff's wife's report, the ALJ specifically addressed it in the underlying decision.  (*Id.*
at 22 ["According to his wife, the claimant explained that he had lost his personality and
was an angry person."].)  Third, and more broadly, Plaintiff's wife's description of
Plaintiff's conduct during blackouts did not identify any *limitations* beyond those identified
by Plaintiff.   And as noted, where "the ALJ . . . validly rejected all the limitations described
by the lay witnesses in discussing [the claimant's] testimony, . . . the ALJ's failure to give
specific witness-by-witness reasons for rejecting the lay testimony . . . [is] harmless."
*Molina*, 674 F.3d at 1122.

Accordingly,

**IT IS ORDERED** that the ALJ's decision is **affirmed**.

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment accordingly
and terminate this action.

Dated this 14th day of March, 2023.

_____
Dominic W. Lanza
United States District Judge